IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

DERRICK CARTER,

              Defendant.

CRIMINAL ACTION
NO. 18-561-1

## OPINION

**Slomsky, J.**                                                                 **June 22, 2020**

## I.   INTRODUCTION

Before the Court is Defendant Derrick Carter's Emergency Motion for Pre-Trial [sic] Release.  (Doc. No. 107.)  Defendant filed the instant Motion on April 8, 2020, seeking release from custody due to concerns over the recent COVID-19 global pandemic and how it would affect his health based on his underlying conditions.  The Government opposes the Motion on the grounds that Defendant does not present compelling circumstances for release and that the United States Bureau of Prisons ("BOP") has implemented adequate measures to mitigate the risks of COVID-19.  (Doc. No. 108.)  For the following reasons, the Court will deny Defendant's Motion for Pre-Trial Release.

## II.   BACKGROUND

### A.  Charged Conduct

On December 6, 2018, a grand jury returned an Indictment charging Defendant with the following offenses:

> 1) Possession of a firearm on May 23, 2018, by a convicted felon in violation of 18 U.S.C. § 922(g)(1) (Count II);

2) Distribution of a mixture and substance containing a detectible amount of cocaine base ("crack"), a Schedule II controlled substance, on May 23, 2018, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) (Count III); and

3) Aiding and abetting the distribution of a substance containing a detectable amount of cocaine base ("crack"), a Schedule II controlled substance, on June 6, 2018, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2 (Count IV).

(Doc. No. 1.)  On October 29, 2019, the Government filed a Superseding Indictment; however, the charges set forth are the same as those charged in the initial Indictment.  (See Doc. No. 67.)

The Government asserts that Defendant engaged in two separate transactions involving the sale of an illegal firearm and narcotics to a Confidential Informant ("CI") and to an undercover Task Force Officer.  (Doc. No. 52.)  First, the Government alleges that on May 23, 2018, Defendant and the CI arranged the sale of a Sig Sauer MCX high-powered Rifle and two ounces of "crack cocaine" to the undercover officer.  (Id. at 4.)  The Government proffers that it has a monitored and recorded telephone call evidencing Defendant's conduct in this transaction.  (Id. at 6.)  The Government also claims that later on the same day, the CI met with Defendant in the area of 1517 Arrott Street in Philadelphia and brought him to an undercover vehicle, which Defendant entered. Defendant then gave the officer the Sig Sauer MCX Rifle and crack cocaine in exchange for $5,500 in government funds.  (Id. at 7.)  According to the Government, this transaction was both audio and video recorded.  (Id.)

Second, the Government alleges that on June 6, 2018, Defendant arranged for the CI to purchase a MAC-10 type pistol and two ounces of crack cocaine from his associate.  (Id. at 7-8.) The Government claims that the conversation between Defendant and the CI coordinating the transaction took place over a monitored and recorded telephone call in the presence of Special Agent Craig Bosnjak, Alcohol Tobacco and Firearms, and Task Force Officer Craig Fife, and that the Government will produce the recording at trial.  (Id. at 8.)  Further, the Government alleges

that the CI met with Defendant's associate later that day and the transaction resulted in the sale of one ounce of crack cocaine.  (Id. at 9.)  The MAC-10 pistol was never produced for sale.  (Id.)

### B.  Procedural History

On December 6, 2018, following the return of the Indictment, United States Magistrate Judge Marilyn Heffley issued a bench warrant for Defendant.  (Doc. No. 2.)  At the time, Defendant was detained by Philadelphia authorities.  On December 10, 2018, the Court ordered Defendant be produced for prosecution in this case.  (Doc. No. 5.)  On December 26, 2018, United States Magistrate Judge Carol Sandra Moore Wells ordered him detained pending trial.[1]  (Doc. No. 21.)

On August 22, 2019, Defendant filed a Motion for Reconsideration of the Denial of Pre-Trial Release (Doc. No. 51), which was effectively a request for review of Judge Wells's decision. On September 19, 2019, the Court denied Defendant's motion, finding that the charged offenses triggered the statutory presumption under 18 U.S.C. § 3142(e)(3)(A) "that no condition or combination of conditions will reasonably assure the appearance of [Defendant] as required and the safety of any other person and the community" and Defendant failed to rebut the presumption. (Doc. No. 59. at 5.)

During his pretrial detainment, Defendant has waived his right to a speedy trial on several occasions.  (See Doc. Nos. 25, 37, 44.)  Due to these continuances, the trial date was set for December 9, 2019. However, prior thereto, on November 22, 2019, Defendant filed a Motion to

---

[1]    In the Government's Motion for Pretrial Detention, it noted that "Defendant is a convicted felon with a prior criminal history consisting of aggravated assault (F-2), terroristic threats (M-1), reckless endangering (M-2), simple assault (M-2), contempt of court (3 counts), and possession of controlled substance by person not registered (M)[.]"  (Doc. No. 15 at 1.)  It also noted that if convicted, Defendant faces a maximum and minimum penalty of "70-years' imprisonment, a mandatory minimum of five-years imprisonment, a mandatory minimum of four-years of supervised release, a $6,250,000 fine, and a $300 special assessment."  (Id. at 3.) Moreover, the Government alleged in its Motion, that Defendant's criminal conduct in this case occurred while he was serving a probationary sentence for a state offense.  (Id. at 1.)

Dismiss the Superseding Indictment (Doc. No. 83), which this Court must consider before a trial may be held. As a result, the date of trial is now uncertain, especially given the current circumstances arising from the global pandemic.

On April 8, 2020, Defendant filed the instant Emergency Motion for Pre-Trial Release. (Doc. No. 107.) Defendant asserts that he should be granted pretrial release because the COVID-19 global pandemic presents a compelling change in his circumstances given his medical history. (Id. at 2.) Defendant purports that he "falls into a select group of individuals who are at the highest risk for severe disease and death [from COVID-19 infection] because of his underlying health conditions including Type II Diabetes and Asthma." (Id. at 6.) Defendant argues that, taken together, the COVID-19 pandemic and his health conditions "make his circumstance extraordinary." (Id. at 2).

To evidence his medical condition, Defendant consented to the Government's production of his medical records from the Philadelphia Federal Detention Center ("FDC"). (Doc. No. 117.) Those records show that on December 14, 2018, Defendant reported his asthmatic condition during an initial health screening at the Philadelphia FDC. (Id. at 11.) A few days later, on December 17, 2018, Defendant was prescribed a "rescue" Albuterol Inhaler HFA for non-daily use to prevent asthma attacks, as needed. (Id. at 10.) On December 28, 2018, Defendant underwent his first Physical Evaluation at BOP Health Services where he reported that he developed asthma "a few years ago," but denied any "chest pain, sob, cough, wheezing, night symptoms." (Id. at 6.) During the exam the doctor also recorded "no Respiratory Distress," and that Defendant's lungs were clear with no respiratory issues such as wheezing, crackles, or Rhonchi. (Id. at 7, 26.) During this exam, Defendant was prescribed a second "rescue" Albuterol Inhaler HFA (8.5 GM) 90 MCG/ACT. (Id. at 8.) On February 13, 2019, a radiologist examined films of Defendant's heart and lungs and

4

reported Defendant's lungs as "clear."  (Id. at 75.)  On June 12, 2019, Defendant had another

follow-up exam in which he "denie[d] chest pain, sob, cough, wheezing, night symptoms." (Id. at

100.)  He also reported using his albuterol inhaler "only when he plays basketball."  (Id.)  On

December 12, 2019, Defendant had another evaluation at the BOP Chronic Care Clinic, which

reports,

> Asthma: Patient denies cough, wheezing, chest pain, SOB, difficulty
> breathing, dizziness, or other respiratory complaint. He reports
> using his Albuterol rescue inhaler about two times per week. He
> states his most recent asthma attack was many years ago, and he
> denies any hospitalizations related to asthma. Continue rescue
> inhaler as needed.

(Id. at 88.)

Throughout his incarceration at the Philadelphia FDC, Defendant has refilled his inhaler

prescription three times[2] and has reported no changes in his condition.  (Id. at 128.)  In his most

recent visit to BOP Health Services on April 16, 2020, Defendant made no mention of his Asthma

condition.  (Id. at 83.)

Defendant also submits that he is a good candidate for pretrial release because he poses no

risk of flight or danger to the community.  Defendant proffers that he does not pose either one

because he is a lifelong Philadelphia resident with strong ties to the community.  He is 26 years

old and, prior to his arrest, was employed by T&R Homes, a construction business located in

Philadelphia.  His family also resides in Philadelphia, including his infant daughter.  (Doc. No. 107

at 3.)  Defendant notes that he "is committed to his defense in court and, therefore, possesses no

threat to the community or risk of flight."  (Id.)  Additionally, Defendant contends that he poses no

---

[2]   Defendant refilled his Albuterol Inhaler in approximate six-month intervals, on December 31,
2018, June 13, 2019, and December 13, 2019.  (Doc. No. 117 at 128.)  Each Albuterol Inhaler,
however, is meant for a 90-day supply.  (Id. at 90.)  Thus, the implication is that Defendant is
using his inhaler less frequently than the standard indication.

safety risk to the community because he "has known the identity of the confidential informant" and despite that knowledge, the CI has not been threatened or injured. (Id.) If released, he offers to live with either his sister, Victoria Carter at 944 Tyson Avenue, Philadelphia, Pennsylvania 19111, or with his Aunt, Nancy Kelly, at 6429 North 16th Street, Philadelphia, Pennsylvania 19144. (Id.) Defendant agrees to "the strict supervision of Pretrial Services" and electronic monitoring as a condition of release. (Id.)

On April 13, 2020, the Government filed its Response in Opposition to Defendant's Emergency Motion for Pretrial Release. (Doc. No. 108.) The Government contends that Defendant's release is not warranted for two reasons. First, the Government asserts that Defendant's health conditions "[do] not present any unique circumstances" because his situation is similar to numerous incarcerated offenders and the existence of COVID-19 alone is not a sufficient reason for his release. (Id. at 1, 3, 8.) Second, the Government stresses that the BOP is "taking aggressive steps to mitigate the risk from COVID-19." (Id. at 1.) The BOP has implemented a multi-phase Coronavirus Action Plan which is being followed at the Philadelphia FDC. (Id. at 4-7.) The Plan, which entered "Phase Five" on April 1, 2020, requires (1) all inmates to be quarantined inside their cells for a period of 14 days, (2) severe limitation of inmate movement inside the facilities and access to communal spaces, (3) cancellation of staff travel and trainings, (4) screening of all faculty and new inmates for COVID-19 symptoms, and (5) suspension of all volunteer, social, and legal visits as well as contractors performing non-essential services.[3] (Doc. No. 108 at 4-7.)

---

[3]   Over the past several months, Alisha Gallagher, an attorney employed by the Federal Bureau of Prisons, has kept the Court apprised of the BOP's efforts to prevent the spread of COVID-19 in the Philadelphia FDC, and provided updates to the Court when staff or inmates test positive for the coronavirus. In a letter dated May 19, 2020, Gallagher confirmed that the BOP's mitigation measures discussed above will remain in effect until June 30, 2020. In

On May 6, 2020, the Court held a hearing via video teleconference during which counsel for both parties advanced their respective arguments.  (Doc. No. 120.)  Counsel for Defendant argued that Defendant does not pose a danger to the community or a flight risk, and that due to Defendant's medical vulnerability in the COVID-19 environment, he should be granted pretrial release.  Counsel stressed that COVID-19 presents a changed circumstance warranting release and that Defendant is unlikely to flee because of his fear of contracting the COVID-19 virus and because he has every intention to defend himself in this case.  Counsel also argued that Defendant would not pose a danger to the community because engaging in future offenses may involve person-to-person contact, exposing him to contracting the virus.

At the hearing, Defendant also testified about his medical history and the conditions at the Philadelphia FDC.  He stated that he has a history of asthma, pre-diabetes and epilepsy.  He further claimed that he was hospitalized in November 2017 for heart related issues and was in a coma for two weeks; however, no medical records evidencing this medical incident were presented to the Court.  Defendant also testified that the current conditions at the Philadelphia FDC do not mirror the robust plan promoted by the BOP.  According to Defendant, inmates have not been wearing

---

addition, Gallagher reported that on May 18, 2020, the Philadelphia FDC began testing all newly detained persons for COVID-19 prior to release to general population.  The testing procedure requires 14 days in quarantine, followed by testing using a nasal swab, which is sent to a laboratory for processing.  A detainee remains quarantined until the test result is received. Gallagher also reported that, as of May 19, 2020, three staff members at the Philadelphia FDC had tested positive for coronavirus and recovered.  On June 2, 2020, Gallagher sent another letter to the Court, reporting that one arriving inmate tested positive for COVID-19 at the end of his quarantine period.  According to Gallagher, this inmate and his cellmate (who tested negative for COVID-19) will remain in quarantine for an additional 14-day period.  Both the inmate and his cellmate are currently asymptomatic.  On June 4, 2020, Gallagher sent an email to the Court, disclosing that a second inmate in the quarantine unit had tested positive for COVID-19 at the end of his quarantine period.  That inmate has been released from custody for time served, and the local health department has been informed of his release into the community.  The second inmate's cellmate tested negative for COVID-19 but will remain in quarantine for an additional 14-day period.

masks or staying six feet apart from each other.  He further noted that there has been no testing of staff or inmates and described BOP measures to prevent the spread of infection as a "façade."

The Government countered that the Motion should be denied because Defendant's medical conditions do not present a serious risk factor for severe COVID-19.  The Government noted that Defendant has never been hospitalized for asthma-related complications and that Defendant admitted in a medical evaluation on December 12, 2019 that "his most recent asthma attack was many years ago." (Doc. No. 117 at 88.) Thus, according to the Government, Defendant's condition is not a compelling reason to justify pretrial release.  It also noted that new research suggests that asthma is not a leading comorbidity risk for COVID-19.  Furthermore, the Government stated that Philadelphia County reported a considerable rate of COVID-19 infections, and therefore his risk of contracting COVID-19 would not necessarily be lessened if he were released.

The Government stressed that Defendant is not a good candidate for pretrial release.  It described in detail the alleged conduct that led to the charges, including that Defendant was engaged in multiple transactions involving the sale of illegal firearms and narcotics.  It further noted that due to the charges he faces, Defendant is subject to the presumption that there are no conditions or combination of conditions that could assure the safety of the community and Defendant's appearance at trial.  The Government also proffered that it has substantial evidence to support the charges, including audio recordings of Defendant arranging the transactions and video recordings of Defendant engaging in the sale of firearms and drugs to an undercover officer.

### III.    DISCUSSION

#### A.  The Analytical Framework and Other Considerations Regarding Motions for Temporary Pretrial Release Pursuant to 18 U.S.C. § 3142(i)

Defendant asks the Court to reconsider his pretrial detention in light of the danger posed by the current COVID-19 pandemic and his medical history.  He relies on 18 U.S.C. § 3142(i) as the statutory basis for his Motion.  That Section provides in part,

> [A] judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for . . . [a] compelling reason.

18 U.S.C. § 3142(i).

As this Court noted in United States v. Gongda Xue,

> In light of the COVID-19 pandemic, Section 3142(i)'s potential applicability is clear, but whether relief is warranted under that Section is considered on a case-by-case basis.  Federal courts have been inundated with requests from defendants seeking release from detention due to the risks presented by COVID-19.  Case law on the subject has grown at a seemingly exponential pace.
>
> This Court has made every effort to stay apprised of the latest decisions and the analytical framework for reviewing Section 3142(i) requests filed in response to the current pandemic.  While there has been some discrepancy among courts about how these requests should be resolved, two guiding tenets have emerged.  First, the generalized risk of COVID-19 is not, in and of itself, a sufficient reason to justify release.  Second, Section 3142(i) motions must be considered within the larger context of the requirements of the Bail Reform Act.  Thus, resolving Section 3142(i) motions requires an individual assessment of the movant's characteristics and circumstances in light of these two considerations.

No. 18-122, 2020 U.S. Dist. LEXIS 81282, at *15 (E.D.Pa. May 8, 2020) (tenet order modified).

First, courts have generally "rejected emergency motions for release . . . based solely on the generalized risks that COVID-19 admittedly creates for all members of our society."  United States v. Denmark, No. 19-CR-15, 2020 U.S. Dist. LEXIS 73640, at *15 (M.D.Pa Apr. 27, 2020)

(internal citations omitted).  "Rather, at a minimum[,] courts have typically required proof of a '[d]efendant's particular vulnerability to the disease [in order to] constitute a compelling reason for release under § 3142(i).'"  Id. (quoting United States v. Keith Kennedy, No. 18-20315, 2020 U.S. Dist. LEXIS 53359, at *4 (E.D. Mich. Mar. 27, 2020)).  Recently, in related contexts, the Third Circuit Court of Appeals has endorsed this concept, requiring proof beyond COVID-19's generalized risks when a defendant seeks release from detention.

In United States v. Raia, in considering a petition for compassionate release, the Third Circuit stated,

> We do not mean to minimize the risks that COVID-19 poses in the … prison system, particularly for inmates … But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify … release.

954 F.3d 594, 597 (3d Cir. 2020).

Similarly, in United States v. Roeder, in considering a motion for release from detention pending sentencing, the Third Circuit explained that,

> [T]he existence of a widespread health risk is not, without more, a sufficient reason for every individual subject to a properly imposed federal sentence of imprisonment to avoid or substantially delay reporting for that sentence[.]

No. 20-1682, 2020 U.S. App. LEXIS 10246, at *7 (3d Cir. Apr. 1, 2020).

Although neither case involved a motion for temporary release under Section 3142(i), the concept is "equally applicable" to this Section.  See Denmark, 2020 U.S. LEXIS 73640, at *15 (denying a defendant's Section 3142(i) motion and citing Raia and Roeder).  Thus, for a movant to satisfy his burden of proof under Section 3142(i), he must make an "individualized and specific showing of a compelling reason[.]"  United States v. Brown, No. 19-259, 2020 U.S. Dist. LEXIS 74193, at *11 (M.D.Pa. Apr. 28, 2020).  There is no "one-size-fits-all, blanket approach" to

resolving this issue.  United States v. Nikparvar-Fard, No. 18-101-1, 2020 U.S. Dist. LEXIS 87370, at *10 (E.D.Pa Apr. 20, 2020).

Second, decisions by other district courts make clear that a motion seeking temporary release under 18 U.S.C. § 3142(i) also includes a consideration of the Bail Reform Act as a whole. See e.g., United States v. Green, No. 19-233, 2020 U.S. Dist. LEXIS 75950, at *12 (M.D.Pa. Apr. 30, 2020).  In this Act, Congress created a comprehensive set of statutory guidelines governing release and detention decisions for criminal cases in federal court.  One precept is that persons must be released so long as the court can be reasonably assured that they do not pose a flight risk or danger to the community.  18 U.S.C. § 3142.  To that end, detention is the exception; and to the extent that conditions, or a combination of conditions, can be fashioned to reasonably provide such assurances, the individual must be released.  Id.

In assessing what, if any, conditions can be fashioned, courts are directed to consider the factors enumerated in 18 U.S.C. § 3142(g).  Those factors include: (1) "the nature and circumstances of the offense charged[;]" (2) "the weight of the evidence against the person;" (3) "the history and characteristics of the person," including their financial resources, community and family ties, and record of appearing at court proceedings; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g)(1)-(4).

In addition to these factors, the Bail Reform Act also requires district courts to weigh release decisions against certain statutory presumptions, including a presumption in favor of detainment for defendants charged with violent crimes or serious drug trafficking offenses.  In these cases, "[s]ubject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the

safety of the community if the judicial officer finds that there is probable cause to believe that the person committed," one of the enumerated offenses.  18 U.S.C. § 3142 (e)(3).  An indictment "is sufficient to support a finding of probable cause triggering the rebuttable presumption of dangerousness under § 3142(e)."  United States v. Suppa, 799 F.2d 115, 119 (3d Cir. 1986) (noting that although the Government always carries the burden of persuasion, the probable cause determination predicated on an indictment merely shifts the burden of producing lack of evidence of dangerousness onto the defendant).

If a person is detained, Section 3142(i) provides a "limited safety valve provision,"  United States v. Washington-Gregg, No. 19-331, 2020 U.S. Dist. LEXIS 72355, at *14 (M.D.Pa. Apr. 24, 2020), enabling courts to re-examine detention decisions "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i).  But in the COVID-19 environment, this re-examination does not take place in isolation.  Rather, courts also have considered the following factors:

> (1) the specificity of the defendant's stated COVID-19 concerns, (2) the original grounds for the defendant's pretrial detention, (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would increase COVID-19 risks to others.

United States v. Deshields, No. 19-cr-99, 2020 U.S. Dist. LEXIS 73643, at *7 (M.D.Pa Apr. 27, 2020) (citing United States v. Clark, No. 19-40068, 2020 U.S. Dist. LEXIS 51390 (D. Kan. Mar. 25, 2020)) (series order amended).  "The court will not necessarily weigh these factors equally, but will consider them as a whole to help guide the court's determination as to whether a 'compelling reason' exists such that temporary release is 'necessary.'"  Denmark, 2020 U.S. Dist. LEXIS 73640, at *17 (quoting Clark, 2020 U.S. Dist. LEXIS 51390, at *3).

**B. Defendant's Motion for Pretrial Release Will Be Denied**

Defendant's Motion will be denied because he has not demonstrated a compelling reason for his release under 18 U.S.C. § 3142(i) and because no condition or combination of conditions can be fashioned to assure Defendant's appearance in court and the safety of the community. In reaching this decision, the Court has considered four factors: (1) the specificity of Defendant's COVID-19 concerns, (2) the original grounds for Defendant's pretrial detainment, and the relevant factors under the Bail Reform Act, 18 U.S.C. § 3142(g), (3) the extent to which Defendant's proposed release plan is tailored to either mitigate or exacerbate the risks of COVID-19, and (4) the likelihood that Defendant's proposed release would increase COVID-19 risks to others. None of these factors alone are determinative of Defendant's eligibility for release; rather, the Court has balanced all the factors as a whole in light of Defendant's individual circumstances. Each factor will be discussed in turn below.

First, Defendant's COVID-19 concerns lack the particularized vulnerability to COVID-19 needed to constitute a compelling reason for temporary pretrial release. Although Defendant asserts that he "falls into a select group of individuals who are at the highest risk for severe disease and death [from COVID-19 infection] because of his underlying health conditions including Type II Diabetes and Asthma" (Doc. No. 107 at 6), the objective medical evidence does not show that his medical conditions are severe enough to justify pretrial release. While in custody, Defendant was prescribed a "rescue" inhaler for the purpose of preventing or alleviating an asthma attack. (Id. at 10.) Yet, Defendant admits that his last asthma attack was "several years ago." (Id. at 88.) In addition, he stated that he only uses his inhaler "when he plays basketball." (Id. at 100.) Further, according to his medical records, Defendant has repeatedly denied any "cough, wheezing, chest pain, SOB [shortness of breath], difficulty breathing, dizziness, or other respiratory complaint." (Id. at 88, 100.) Indeed, during his most recent medical evaluation at the BOP on April 16, 2020,

Defendant's asthma was not mentioned at all. (Doc. No. 83.) Thus, based on the objective medical evidence, Defendant's mild case of asthma does not constitute a compelling reason to justify release.[4]

Second, the original grounds for Defendant's pretrial detention continue to support pretrial detention. In the Superseding Indictment, Defendant is charged with two counts of violating the Controlled Substances Act, 21 U.S.C. §§ 841(a)(1), (b)(1)(B) and 841(a)(1), (b)(1)(C). Each offense carries a maximum term of imprisonment of ten years or more. Defendant therefore faces the statutory rebuttable presumption that no condition or combination of conditions will reasonably assure his appearance at trial and the safety of the community. And while Defendant may rebut the presumption, he has not done so here. In fact, the instant Motion simply reiterates the same arguments—namely, his longstanding community ties and familial support—advanced in his prior motion for reconsideration of his bail. Those factors were unpersuasive then and they remain unpersuasive now.

Defendant did not rebut the statutory presumption also because the relevant factors under the Bail Reform Act, 18 U.S.C. § 3142(g), support his continued detention. The nature and circumstances of the offenses are troubling. Defendant has been charged with very serious crimes, including selling a high-powered automatic rifle and three ounces of crack cocaine. Furthermore, the weight of evidence against Defendant appears to be strong. The Government asserts that it has

---

[4]   During the hearing held on May 6, 2020, Defendant testified that in 2017 he was hospitalized and comatose for two weeks due to heart-related issues. While the Court does not dispute the validity of Defendant's testimony, its persuasive value is limited because Defendant provided no supporting documentation about the incident. (See Doc. No. 120.) The Court is therefore unable to ascertain the underlying cause of the hospitalization, continuing risk, and any other aggravating or mitigating factors connected to the hospitalization. Further, Defendant has not explained how this hospitalization demonstrates a particular vulnerability to COVID-19. For these reasons, Defendant's proffered hospitalization carries little weight when considering whether he has shown a compelling reason for temporary pretrial release.

14

video surveillance of the transactions, incriminating audio and video recordings, and physical evidence of the firearm and narcotics that the undercover officer and the CI purchased from Defendant and his associate. (Doc. No. 59 at 5-6.) In addition to the video evidence showing the purchase of the firearm and narcotics by the undercover officer, the Government also asserts that it has a recorded phone call of Defendant making self-incriminating statements. (Doc. No. 52 at 4, 7, 8.)

Defendant's personal history and characteristics also do not support his release. His criminal record includes a felony conviction for aggravated assault, for which he was sentenced to 11 to 23 months' imprisonment, and other misdemeanor convictions. (Doc. No. 52 at 13.) In addition, Defendant has been found in contempt of court three times, and his arrest for the conduct charged in this case occurred while he was serving a probationary sentence for a state offense. (Id. at 13, 15). In light of these countervailing factors, Defendant's longstanding community ties and family support do not overcome the statutory presumption he faces. Thus, the original grounds for Defendant's pretrial detention support his continued incarceration pending trial, given that there are no conditions or combination of conditions that will assure the safety of the community or his appearance at trial.

Third, Defendant's proposed release plan probably mitigates his risk of contracting COVID-19. Although Defendant did not testify about his living conditions at the FDC, it is likely that he shares a cell with another inmate. As a result, there are certain proactive measures he cannot practice, such as maintaining six feet of separation from other persons, that public health experts recommend to limit the risk of contracting COVID-19. Additionally, prisons generally present a breeding ground for COVID-19 transmission because many persons reside in close quarters. Thus, in theory, if Defendant was granted temporary pretrial release and lived with either

his sister, Victoria Carter, or with his Aunt, Nancy Kelly, he could probably better protect himself from the coronavirus.[5]  (Doc. No. 107 at 3.)

But when balancing all the factors together as a whole, Defendant has not provided the Court with a compelling reason for release.  While the Court acknowledges Defendant's concerns about contracting the COVID-19 virus while in federal custody, his health conditions are not severe enough to warrant an individual exception to pretrial detainment.  Based on the objective evidence, Defendant has a mild case of asthma and faces no greater risk of COVID-19 related complications than his fellow inmates.  Furthermore, when viewing the seriousness of Defendant's charges and the weight of evidence against him, his health concerns fail to defeat the statutory presumption that no combination of conditions will reasonably assure his appearance in court or the safety of the community.  Finally, while the Court recognizes the possibility that Defendant's proposal for release may help to mitigate the risks of COVID-19, this factor alone is not strong enough to change the Court's decision requiring Defendant's pretrial detainment, especially given that he allegedly engaged in the conduct charged here while on state probation.  For all these reasons, the Court will deny Defendant's request for temporary release from custody while awaiting trial.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Emergency Motion for Pre-Trial Release (Doc. No. 107) will be denied.  An appropriate Order follows.

---

[5]    The fourth factor a court considers when evaluating Section 3142(i) motions in the COVID-19 environment—i.e., the likelihood that the defendant's proposed release would increase COVID-19 risks to others—is neutral. Defendant's risk of transmitting COVID-19 to others is too speculative to be considered.  See United States v. Gongda Xue, No. 18-122, 2020 U.S. Dist. LEXIS 81282, at *26 n. 10 (E.D.Pa. May 8, 2020) (finding whether the defendant's proposed release would increase COVID-19 risks to others to be a neutral factor in the Section 3142 analysis given the speculative nature of COVID-19 transmission).